## The General Rucker.

### Hall v. Sims.

*(District Court, W. D. Tennessee.* March 31, 1888.)

**1. Evidence—Weight—Negro Testimony.**
   While race distinctions, affecting the intelligence and moral *stamina* of the witnesses, are to be considered in weighing their testimony, care should be taken not to exaggerate the consideration into a mere aversion for the witness' testimony on account of his race.

**2. Seamen—Assault by Mate.**
   The law does not permit the mate of a steam-boat to enforce obedience to his orders by beating one of the crew engaged in loading the vessel, and the humane statutes which forbid it must be obeyed.

**3. Same—Liability of Ship-Owner—Master and Servant.**
   Whether a court of admiralty proceeds against the owner for personal injuries inflicted by the mate upon one of the crew, upon a distinctive principle of its own, growing out of the relation of the crew, to the owner of the vessel, or only on the common-law principle of master and servant, if the mate strike and injure the libelant while both are engaged in loading the vessel, intending to enforce obedience to his orders, or to drive him to more efficient work, the owner is liable for the injury *in personam* in the admiralty.

**4. Damages — Personal Injuries — Assault — Indignity — Measure of Damages.**
   Courts of admiralty do not allow extravagant damages for personal injuries that are not permanent or serious, upon any consideration of personal indignity offered to a roustabout who is beaten by the mate while at work. One hundred dollars allowed in this case.

In Admiralty.

Libel *in personam* demanding $2,500 damages for personal injuries to the libelant, caused by a blow on the head with a monkey-wrench in the hand of the mate while both were engaged in loading machinery from a barge along-side of the steam-boat General Rucker, of which the defendant was the owner. The facts are stated in the opinion of the court.

*J. S. Duval* and *J. M. Greer*, for libelant.

*Poston & Poston*, for defendant.

HAMMOND, J. The disputed issue of fact in this case must be decided for the libelant unless it is to be taken as a rule of evidence that the testimony of a white man shall prevail, *per fas et nefas*, over that of a negro, which can never be tolerated in any intelligent and impartial tribunal for the trial of such issues, whether by judge or jury, either avowedly or covertly, by the invention of some pretense to disguise the operation of pure prejudice on that subject. In what was said about this matter at the bar the learned counsel for the defendant justly and somewhat indignantly repudiated any reliance upon such a prejudice, but insisted that the difference between witnesses in intelligence, moral *stamina*, and like elements of substantial character entering into the problem of decision, should turn the scale in any event, whether that difference arises from race distinctions or other causes, and there can be no doubt of the justice of that rule, as he states it. But, like all other considerations of that kind, in the application of the principle, there must be a careful scrutiny

into all the circumstances, so that there shall be no unjust exaggeration of it into one of mere aversion against the testimony of the witness on account of his race. The mate swears positively that he did not strike the libelant at all, and, if they were both white or both black, the burden being on the libelant, he would necessarily fail, if that were all the proof, and each were equally with the other entitled to credit. But the corroborating circumstances certainly proved are with the libelant.

First, his wounded skull, exhibited immediately after the occurrence, with a persistent statement that the wound was made in the manner he now states it to have been, corroborates his story. There is not the faintest suggestion in the proof to account for that wound in any other way except the reluctant and very evasive answers of the mate, on cross-examination, that he might have struck him with the stick which he admits he threw at the gang of roustabouts at work on the vessel. But another one of them it was he struck on that occasion, and he was arrested at the time on the affidavit of that other. The counsel here suggests that the wound may have been made by contact with the sides of the vessel or barge as the libelant fell into the river between them, or by some contact like that in falling. Certainly, it may have been, but nothing then occurring in relation to that circumstance suggests that as a cause of the wound. The libelant's witnesses swear that he then and there vociferously accused the mate of striking him with the monkey-wrench, and knocking him into the river, and that the mate suppressed his complaints by compelling him to return to work, with threats of shooting him. The mate denies this, as he does the striking, and his witnesses did not hear it, some of them saying they saw no wounds or blood on the face; but two of his witnesses, most favorably situated to see what occurred, did see the wound and blood. One of these, Pat Sheridan, heard no remark about the wound, being evidently attentive to his duty as engineer of the "nigger-engine," with which the machinery was being lifted from the barge to the vessel, and possibly too far away to hear everything that was said; but the other, Bradford, another mate, whom all agree was right at hand, not only saw the wound and blood on the face, but also heard libelant accuse the mate of striking him and knocking him into the river. He says the mate denied it, and that he remarked that libelant might have got the hurt in falling, but that he continued to accuse the mate of having struck him, which corroborates the libelant's witnesses on that point.

Next, the mate has not a very good reputation for mild-mannered conduct in dealing with roustabouts. He has been three times arrested by the marshal of this district on warrants sworn out for similar offenses, and the owner of this boat, the defendant here, took occasion to warn him against abusive treatment when employing him, and to put him under strict instructions against striking them. The witnesses testify to his violent demeanor in driving them about their work. It is a matter of general knowledge, as we well know in this court, that it is considered on the river that these roustabouts cannot be managed effectively in any other way, and that the river men complain that it is an obstruction to

commerce to deny to them the privilege of compulsion by physical force. But, as was said in *Riley* v. *Allen*, 23 Fed. Rep. 46, this consideration, whether sound or unsound, cannot be allowed to override the acts of congress forbidding the use of corporal punishment in such cases. The arguments in favor of it are no doubt forcible enough to those interested in maintaining the practice, but they were considered by congress when the law permitting it was, in response to a humane public opinion, abolished. Steam-boat owners, captains, and mates must obey that law, no matter what they think of it, and whether they can find other effective methods of getting work out of the roustabouts or not. I do not think these mates intend to wound or seriously injure the men, but in the conflict between them they often passionately overstep their intentions, and strike with serious injury. I do not think, in this case, there was any intention to wound, but only to stop the libelant from "talking back," and to drive him to his work.

Again, the conduct of the libelant and others who were struck of going to the magistrate that night and swearing out warrants for the mate's arrest, corroborates libelant. Of course it is possible that this negro man of inferior intelligence conceived the idea, as did the other two, of taking advantage of the circumstance that in falling he had cut his head to wholly fabricate a story of being beaten, and of all three going before a justice of the peace, and each falsely complaining of an assault and beating by this mate; also that he would set up such a charge in order to bring this suit for damages. But that theory of accounting for their conduct is improbable, for it was well said by the learned counsel of libelant that these simple-minded negroes are scarcely equal to such a scheme as that. Under the explanation given by Capt. Sims, the defendant, for settling those prosecutions and paying the costs, that circumstance cannot be taken as corroborative of libelant's testimony; but the mere fact of an immediate accusation before the officers of the law is, considering the simplicity of the negro character, taken in connection with his then bleeding wound, and the complaints of the others of a beating at the same time, strongly suggestive of the fact that this mate was pursuing the usual method—to which they are nearly all addicted, and which they dislike to give up—of enforcing obedience to his orders by physical force. Under these circumstances it is more probable that he struck this man than that he did not, notwithstanding that he denies doing it and that he is a white man and the other a negro. But, besides this, we have the positive testimony of libelant's witnesses that they saw the blow struck, and the story they tell is reasonable enough after making allowance for their exaggerations of the enormity of the mate's conduct. Their belief that the mate intentionally knocked libelant into the river is probably not at all true, and they no doubt magnify the force of the blow, and all their impressions of the occurrences are crude and distorted, perhaps, and yet out of it all the real facts are easily discernible. It is fairly to be inferred that, substantially, the facts are that the mate was engaged in driving the hands to the speedy work necessary to enable the boat to leave that evening, and trying to keep them up to the mark of efficiency nec-

essary to accomplish that purpose, and that in reply to libelant's suggestion that they were green hands at the business he tapped him on the head with the monkey-wrench, or some like instrument, severely enough to make an ugly wound, which turned out to be not very serious, and that the libelant, in his haste to get away and escape further blows, or to get about his work, fell between the vessel and the barge from which the machinery was being transferred and into the river, from which danger the mate promptly rescued him, and saved his life.

Turning now to the defendant's proof, and I find nothing in it necessarily overcoming the circumstances tending to establish the above conclusion of fact. Of course, there is the denial of the mate, but that has already been treated, and the other proof must prevail against it. Nothing in the proof of the other witnesses establishes his denial or necessarily tends to support it. Every one of them testifies, to be sure, that he did not see the blow, and some of them think they would have seen it if there had been one struck; but it is manifest from the nature of the act and the situation of each, as described by himself, that the blow could have been struck and not one of them have seen it. It is a kind of negative testimony of not much value. Certainly, if they had the same opportunity to see it that the libelant's witnesses had, and did not, that is a circumstance to be considered against the witnesses who say they saw it, but it is not at all a conclusive circumstance, and cannot of itself prevail over their positive testimony supported by the exhibition of the wound; for I take it that the wound was not fabricated to make a case for damages, or a case for criminal prosecution before the justice of the peace; and that it is quite improbable that these negroes would conceive and execute a conspiracy to take advantage of a wound otherwise received, to project and carry on three prosecutions for assault and battery and one suit for damages.

The libelant says that the other mate, the witness Bradford, stood by and saw the blow and no doubt he was close enough to have seen it; but that witness was himself engaged in the business of hurrying up the work by superintending it, and, notwithstanding his proximity, may not have seen the blow. He is very positive none was struck; but he did not belong to the "gang" of workmen and was not, like them, at that moment subjected to the immediate supervision of the mate and brought into direct contact with him. Nor does the proof as to the circumstances attending the rescue of the libelant by the mate, establish the impossibility or improbability of the blow being struck. The proof tends to put the mate too far away to have struck the blow at the moment that the cry of "a man overboard" was raised, but the value of this depends wholly on very accurate and very close estimates of time and distance, about which no two of the witnesses at all agree, and in the nature of the case there can be no very precise knowledge as to either time or distance. The mate had to go away to get the piece of gas-pipe with which he rescued the man by holding it out to him. How far he went or how long it took him it is impossible to say, and without showing these with great accuracy, the whole proof becomes quite valueless as to

the issue about the blow. The time between the falling overboard and the raising of the cry is important, and no one can tell how long that was. The relative situation of the two might have been changed after the blow and between the blow and the falling overboard, and still more so between the blow and the raising of the cry. The probability or improbability in the matter depends wholly on the time within which to change the situation, and as to that it is all guess-work; and yet the necessity for changing the situation in order to get the gas-pipe and returning to the side of the vessel to make the rescue is manifest. But we are not left wholly to conjecture on this point, notwithstanding the great conflict among the witnesses as to time, distance, and relative situations of the actors in the exciting scene. One witness, Pat. Sheridan, who impressed me most favorably for his truthfulness, and more than all by his impartiality in this matter, was in charge of the small engine used to lift the machinery in process of loading it·to the vessel, and it was his business to keep his eye on the mate for signals in using the lifts. There was a momentary obstruction to his engine, which required his attention for readjustment, and, while so engaged, he heard the cry of "man overboard," and the cry of the libelant from the water right abreast of witness, and at the same moment saw the mate some six feet in front of witness on the edge of the barge starting forward for the gas-pipe, and his return to the rescue. This is entirely consistent with the testimony of the libelant as to the blow given.

Now, there can be no question whatever that if we rigidly confine the libelant to the *minutiæ* of his story and that of his witnesses, and demand that every detail of it shall be precisely consistent with the ascertained facts before any corroboration shall be established by those facts, it would fail. So would the story of the mate and his witnesses fail under such a process. But it is an unreasonable requirement, and the law of evidence does not demand such consistency of detail in the relation of occurrences of that nature. The truth is that no two witnesses on such occasions quite agree as to the details of an occurrence, and no single witness can tell with absolute precision what took place and describe accurately all the details. The most that any trier of the issue can do is to extract from the consistencies and the inconsistencies of statements the truth as nearly as it may be. That the blow was struck in this case will always remain, argumentatively perhaps, a matter of doubt, but for the practical purposes of judicial judgment it must be taken as an established fact. Perhaps I should refer to the attack on·the libelant for his false statement that he remained at home six weeks, when the proof shows that in less than ten days he worked a week in Memphis. If this be material it may be said that it is doubtful if negroes of this class can ever be accurate as to time and its relation to events. It is notorious that the most intelligent witnesses find difficulty in estimating time, and generally say, "four or five weeks," and "five or six days," etc., in measuring it; but negroes seem to be most unreliable in this respect, almost always. The libelant doubtless thought to exaggerate his sufferings by making the time longer, but it is hardly fair, under the circumstances

already stated, to disbelieve him on that account as to the blow. Moreover, he may well reply *tu quoque*, for this mate swore positively that he paid the libelant that night before he left the boat, while the truth is that he escaped from the boat with the other negroes, and went to the magistrate's office, and returned next day for his pay, slipping on board to avoid the mate, whom he was evidently afraid to meet. It is not quite satisfactory to argue that the one statement is material and the other immaterial to the issue. The mate's statement, if true, would have been quite as strong as a corroborating circumstance of his story as the libelant's would have been a material aggravation of his damages. So much attention to a dispute about a mere matter of fact is necessary, under the circumstances, to avoid any misunderstanding or misrepresentation as to the grounds of this judgment.

It is not at all necessary to consider here the question whether a court of admiralty proceeds against the owner of a vessel upon distinct grounds of its own growing out of the peculiar relations that exist as between the owner and those engaged about navigating a vessel of commerce, in cases like this, or only enforces the ordinary common-law principles of master and servant; for it is conceded by the learned counsel that the defendant is liable on the common-law principle, and to that extent certainly; and, I find no difficulty in adjudging that this case falls clearly within that principle. The supreme court of the United States long ago repudiated the subtleties of numerous cases that have made astute distinctions "as to when the servant may be said to be acting in the employ of his master." *Railroad Co.* v. *Derby,* 14 How. 468, 487. Many of the distinctions come very near nullifying the rule of liability, as that court suggests. Later it reiterates the general doctrine of that case, and uses language which shows that it is not worth while for us to consider the refinements set up in the argument in behalf of the defendant. *Steam-Boat Co.* v. *Brockett,* 121 U. S. 637, 645, 7 Sup. Ct. Rep. 1039. Mr. Wood, in his chapter on the subject, very carefully collates the cases and classifies them; and among others he notices that the Tennessee case of *Puryear* v. *Thompson,* 5 Humph. 397, relied upon by counsel, where the overseer whipped the slave to death, is out of harmony with the correct doctrine. Wood, Mast. & Serv. (2 Ed.) c. 13, p. 552 *et seq.;* Id. 570. Notwithstanding *Deihl* v. *Ottenville,* 14 Lea, 191, it may be doubtful if the Tennessee court would now sustain that case. Counsel for the libelant seems to think it is already exploded by the case of *Transportation Co.* v. *Smith.* 16 Lea, 498, 501, 1 S. W. Rep. 280. But that was a case of controversy with a common carrier, where the liability may be more extensive, as it may be in an admiralty court as against an owner in favor of seamen or other servants of that character. But, after all, this case falls, in my judgment, within the Tennessee rule of liability; and it is always more a question of its application to particular circumstances than a question of the extent of that rule in imposing liability. What I hold here is that a roustabout employed in loading the vessel under the command of the mate, who is wounded by the blows of the mate, given because he does not obey his orders, can recover for the injury against the

owner, because that business about which they are both engaged is within the scope of the master's employment, and clearly so. If it were not, the rule of the liability of the master for the willful torts of his servant while thus engaged would be substantially abrogated. No master intentionally authorizes his servant to do any wrong of his own malevolence, passion, or ill temper, and, presumably, always forbids it, as was actually done in this case, for the mate had orders not to beat the men; and, if a want of that kind of authority in the servant exempts the master, there could scarcely arise a case where the liability would exist, and the rule would be narrowed to the exploded doctrine that the master is liable only for the negligence, but not for the torts, of his agent. It is a mere controversy about words upon insubstantial distinctions, for the practical rule is that the master must not employ malevolent, impassioned, or ill-tempered agents if he does not wish to become liable for the injuries they inflict through the exhibition of ill temper in doing his work. If they, while engaged about his business, act intemperately, it is the same as if he himself, being thus engaged, act in like manner; their act being his act simply because it is done for him, and to help his business along, or is intended to do that. If he lose his own temper, and by violence inflict an injury, the connection of himself with the affair is manifested more clearly to the physical sight of all men, but not in any sense the less so to the judicial sight if his agent, *qua* his agent, do that thing. A mate, driving a seaman or other laborer to speedier work or better work in loading the cargo, by blows, is acting for the owner, in any fair sense whatever.

As to the amount of damages, we have only to read the cases to see that courts of admiralty are never extravagant in the matter of damages in cases like this. The injury was not permanent, or very serious; and, in the nature of the case, the damages cannot be large, if we consider that when men engage in this employment they know full well that it is rough work, and altogether beside the notion that delicate sensibilities are to be protected from outrage by punishment for indignities offered. It has not been long since the corporal chastisement of seamen was permitted by law, owing to the nature and supposed necessities of the service; and the officers of steam-boats find it hard to give it up, no doubt. Altercations and assaults between the master and his crew were never treated in courts of admiralty like those redressed in the common-law courts, which involve in the slightest blow a trespass upon one's dignity and feelings of self-respect. The crew are to be protected from injury; and all beating, wounding, and maltreatment are punished criminally, but the admiralty courts, for the reasons stated, in proceeding civilly are not over-sensitive on the score of wounded feelings only. They compensate the seamen for actual injury, and according to his station, remembering that necessarily he owes an obedience very absolute, and a deference very unconditional, to the orders of his officers, and that he is himself rarely without fault in this regard on such occasions. Like other courts, they may give punitive damages, no doubt, or redress outrageous personal indignities, when occasion requires, but the considerations mentioned amply

account for the comparatively very small sums awarded for damages in suits like this. It is not a court in which to make much money by speculative damage suits for personal injuries.

The libelant will be allowed $100 damages, and his costs of suit. So ordered.